## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

NORBERT MERTENS

    Petitioner,

 vs.

No. 15-CV-0899-MV-SCY

JOANA KLEINSORGE-MERTENS,

    Respondent.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Petitioner's Verified Complaint and Petition for Return of the Children [Doc. 1] and Brief in Support of [the] Verified Complaint for Return of the Children [Doc. 2]. Respondent timely filed an Answer to [the] Verified Complaint and Petition for Return of the Children [Doc. 9]. The Court held an evidentiary hearing on this matter on November 10, 2015 in Santa Fe, New Mexico. The Court, having considered the Petition, Answer, briefs, attached materials, hearing testimony, exhibits, relevant law, and being otherwise fully informed, finds that the Petitioner's Complaint and Petition is well-taken and therefore will be **GRANTED.**

## BACKGROUND

Although this case has been pending before the Court for less than six weeks, it has generated a significant and complicated factual record. Accordingly, in the interest of clarity and concision, the Court will organize its factual findings

thematically and will cabin its discussion to those considerations relevant to the Court's disposition.

## I.     The Family Unit

Petitioner Norbert Mertens is a citizen of the Federal Republic of Germany ("Germany") and is a legal permanent residence of the United States of America ("United States").  Doc. 1 ¶8; Doc. 9 ¶8.  Respondent Joana Kleinsorge-Mertens and the two children in this case, "ACM," age nine (9), and "FSM," age eight (8), are dual citizens of Germany and the United States.  Doc. 1 ¶¶ 6, 9; Doc. 9 ¶ 6, 9.  Petitioner and Respondent are the biological parents of ACM and FSM; they married in Holzminden, Lower Saxony, Germany in 2005.  Doc. 1 ¶ 6-7; Doc. 9 ¶ 6-7.  Both ACM and FSM were born in Germany and resided there until August 2014, at which point the entire family moved to New Mexico.  Doc. 1 ¶ 11; Doc. 9 ¶ 11.

## II.    The Agreement to Return to Germany

The Parties offer divergent views about their agreement to return to Germany after living in the United States.  Stated succinctly, Petitioner testified that prior to departing Germany, he, Respondent, and their two daughters agreed to spend one school year in the United States, after which the entire family would return to Germany together.  *See, e.g.*, Hearing Transcript[1] ("H. Tr.") at 1.  By contrast, Respondent asserts that, although she and Petitioner told their family and

---

[1]     References in this Memorandum Opinion and Order to the "Hearing Transcript" and "In Camera Transcript" refer to an unofficial transcript of the November 10 hearing provided to the Court by its court reporter.  Citations and references citations, therefore, should not be understood to be precise, verbatim accounts, but rather sufficiently close approximations that suffice for the purposes of this Memorandum Opinion and Order.

friends that they would only spend one year in the United States, she and Petitioner secretly planned to remain in the United States indefinitely and engaged in a concerted misinformation campaign to prevent the value of Petitioner's assets from collapsing as a result of Petitioner's absence from Germany. After a careful review of the testimony and exhibits, the Court credits Petitioner's version of events.

***First***, the Court found Petitioner to be a credible, forthright, and candid witness. This impression is reinforced by his reasonable explanations for the supposed inconsistencies in his testimony presented by Respondent's counsel. By way of example, Petitioner explained that while he did renew the lease on the house in Arroyo Hondo, he did so only in mid-June 2015, after it became apparent that Respondent would not permit the children to return to Germany as planned. *See, e.g.*, H. Tr. at 8 ("I was in the situation that I don't get the kids back home, I was desperate. And I decided to have some kind of anchor here that I have to renew the lease, because I don't want to sleep under the bridge when I'm here."). Respondent's own exhibit supports this version of events, insofar as it proves that Petitioner did not execute the lease extension until June 15, 2015. *See* Ex. C.

Similarly, the Court sees no inconsistency in Petitioner's testimony and his opening businesses in the United States, nor his beginning the planning for such ventures before leaving Germany. As Petitioner indicated, the motorcycle touring business did not require a substantial future commitment from him and both businesses could be operated from Germany, such that departing the United States

3

after one year would not pose a substantial obstacle to running these enterprises. *See id* at 6 ("[it] is only an obligation for the time that the tours are going, which are two weeks, approximately" and "you can, you have a corporation that is also in Germany operable"). *See also id.* at 71 ("I offer motorcycle tours for German tourists. I don't need to be here for that. I need the German customers and send them over."). Indeed, given that Petitioner planned to spend a year in the United States, it would be remarkable if he did not find some way to earn an income and occupy himself in New Mexico.

In the same fashion, the Court sees no significance in the fact that the family did not purchase round-trip tickets at the time that they departed Germany. As Petitioner explained in his testimony, he "like[s] the flexibility" and "had Lufthansa points where [sic] I can pay the tickets with, and that makes it almost the same price." *Id.* at 41. There is simply no incongruity between a plan to remain in the United States for one school year and the family's decision not to fix the precise date on which the they intended to leave New Mexico, particularly in light of Petitioner's reservoir of frequent flier points, which apparently substantially reduce any financial benefit associated with purchasing round-trip tickets in advance. Phrased differently, the mere fact that the family elected to retain the flexibility to leave, on, for example, July 2, 2015 as opposed to July 3, 2015, does not imply that they did not plan to limit their time in the United States to approximately one year. *See, e.g.*, *id.* at 69 ("It was clear that we go for school year, and is kind of a date. School

year starts at 12 August … the time spen[t] between 23rd of May and 12th of August, when the new school begins, is flexible.").

Finally, Petitioner explained that he obtained Legal Permanent Resident status because, had he not, he believed that he would have been limited to ninety (90) days in the United States; contrary to Respondent's clumsy suggestion, there is nothing inherent in the act of obtaining such status that would indicate Petitioner's intent to remain in the United States indefinitely. *See id.* at 41-42 (Petitioner explains his understanding that a "green card" is the "allowance to stay [in the United States] for longer than three months"). That is, the fact that Petitioner obtained Legal Permanent Resident status in the United States is equally consistent with a plan to remain in the United States for one year or a plan to emigrate from Germany permanently.

**Second**, third-party testimony supports Petitioner's version of events. Chief among these witnesses is Kerim Hamarat. He explained that he met Respondent in Arroyo Hondo, New Mexico when she was approximately eight years old. *See, e.g.*, H. Tr. at 77 ("I met Joana in Arroyo Hondo maybe 35 years ago… I think she was 8 years old."). After he learned of her return to northern New Mexico in 2014, he made a point of reaching out to her and her family. During their first conversation, Respondent indicated that she and her family planned to return to Germany after a temporary stay in the United States. *See, e.g.*, *id.* at 68-69. ("Originally, she was planning on going back to Germany."). Hamarat continued that over the next few

months, as the relationship between Petitioner and Respondent deteriorated,

Respondent became less clear about what she planned to do.  *See id.* at 69.

Hamarat's recollection finds corroboration in the statements of several

affiants.  First, Peter Kleinsorge, Respondent's uncle, states in his affidavit that in

"June 2014, the Mertens family informed us that they would be moving to the USA"

and that they "clearly stated that the children were to return and attend school in

Germany at a later date."  Ex. 2 ¶¶ 13, 16.  The principal of ACM's school, Andreas

Potthast writes in his affidavit that Petitioner and Respondent told him that "the

duration of the stay in the United States had not yet been determined," that the

"family considered return to Germany after a period of one year," and that, in

anticipation of their return, he reserved space at the school for both ACM and FSM.

Ex. 7.  Similarly, Thomas Jobst, a family friend swore that during a conversation

with Respondent and Petitioner, he "was told that this move was initially planned

for one year and at the end of the year, they would determine if they would be

returning to Germany."  Ex. 1 at 1.  William Hollowed, another acquaintance of the

family, affirmed that during a social encounter, Respondent indicated that the

family planned to spend one year in the United States.  Ex. 5 at 1 ("they wanted to

extend the stay to a year.").

These plans appear to have eventually coalesced into a firm commitment to

return to Germany after one year in the United States.  For example, Thomas Jobst

continued in his affidavit that during her visit with Petitioner to Germany in spring

2015, ACM explained that "she would be coming back soon, because the year in New

6

Mexico will soon be over and she would be attending school in Paderborn." In the same fashion, Dieter Dosquet, a colleague and professional acquaintance of Petitioner, swears during the same trip, ACM noted that "she will be happy to return on [sic] her school in Germany this year." Ex. 8. Finally, Sascha Ninck, Petitioner's former employee, swears in his affidavit that at the end of this same trip, ACM told him, outside of the presence of Petitioner, that "we'll all soon be back here forever. In the summer we're back here and I'll go to school here. I can't wait to see everyone again." While none of these statements is admissible to prove the truth of the matter asserted therein, they all reflect ACM's plans for the future and her beliefs about where she would spend the coming academic year. *See, e.g.*, Fed. R. Evid. 801, 803(3). *See also, e.g.*, *United States v. Ballou*, 59 F. Supp. 3d 1038, 1058 (D.N.M. 2014) (Browning, J.) ("[T]estimony is not hearsay when it is offered to prove only that a statement was made and not the truth of the statement.") (alteration original; internal quotation marks omitted).

**Third**, the Court finds Respondent to be a less credible witness than Petitioner. This determination is grounded both in the Court's impression of Respondent as a witness and in the Court's comparison of Respondent's testimony to the evidence that she cited. With respect to the demeanor and tone of Respondent's testimony, the Court found that her credibility was undermined by the fact that Respondent veered into irrelevant and unwarranted character attacks on matters that had no bearing on the issue before the Court. By contrast, Petitioner, although occasionally emotional and plainly frustrated by the

circumstances that had brought him into a United States District Court, did not resort to *ad hominem* attacks on Respondent and instead focused on offering his narrative.  Moreover, as will become apparent below, Respondent's testimony finds less support in the testimony of the witnesses and exhibits that she marshaled in support of her case than Petitioner's testimony finds in his exhibits; indeed, some of the affidavits appear to contradict directly Respondent's sworn testimony.

In light of these observations, the Court accords less weight to Respondent's testimony.  Moreover, the Court cannot ignore the fact that Respondent's argument would demand that the Court believe that she was willing to deceive friends and family for her pecuniary benefit.  That is, the Court would, in effect, need to find that although Respondent admits that she lied to everyone in her life, including her daughters, to achieve a desired end, she is not doing so now.  Given the weight of evidence to the contrary, the Court will not subscribe to this theory.

***Fourth***, only one affiant obliquely supports Respondent's version of events. Sylke Reick, a social acquaintance of the family, states in her affidavit that in "February, 2014 Mr. and Mrs. Mertens told me that they go in summer in the USA for a longer time" explaining that "[a]s a reason for it they gave professional and financial difficulties of Mr. Mertens in Germany" and that "[b]ecause Mr. Mertens is a known businessman in his hometown, this might not become known."  Ex. J at 1. Thus, in Ms. Reick's view, this "is the reason why the circle of acquaintance had to believe Mrs. Mertens want [sic] to live with her sickly father in the USA."  *Id*. Similarly, she notes that while Respondent and Petitioner "told there [sic] children

8

[in May 2014] that they have to go one or two years to the USA for helping [sic] the grandparents," among "the circle of adults friends became for emigration period more than approx 3 years were spoken maybe also longer." *Id.* at 2 (phrasing original). Even interpreted in the light most favorable to Respondent, the conflicts between this affidavit and Respondent's account are readily apparent. By way of example, Reick states that "the circle of adults [sic] friends" was aware of the family's true intentions, yet many of the affiants discussed above indicated that they believed that the family planned to remain in the United States for approximately one year. Further, Respondent sought to explain the fact that she and Petitioner allegedly deceived their social circle by claiming that the family wanted to avoid a "fire sale" on Petitioner's assets. If this is true, then it is difficult to understand why, according to Reick's testimony, the family was honest with some friends in Germany, who might know people interested in purchasing the assets, but misled Hamarat, an elderly resident of a relatively remote section of northern New Mexico.

No other testimony that Respondent marshals in support of her case supports her version of the family's agreement regarding their move to the United States. For example, Karin Potthast writes in her declaration that Respondent and Petitioner told the children that "they would be going for one year as a time reference and so that the departure from their friends wouldn't hit them as hard" but, in fact, the parents "wanted to stay longer." Ex. K at 1. This, of course, runs counter to Respondent's explanation, which rests on the family's financial interests

and consequent need for secrecy among the community.   Similarly, Ulrike Rose, a social acquaintance of the family, stated in her affidavit that she "liked the idea that Norbert and Joana wanted to find new happiness together in the USA – with an open end. No time limits were stated."  Ex. M.  Such testimony indicates nothing.  The mere fact that the family never expressly stated the date on which they planned to return is the absence of information; it does not imply that they intended to remain indefinitely.

Indeed, even the witnesses that spoke with the family after their move to the United States do not support Respondent's version of events.  Jenna Paulden, who celebrated Thanksgiving with the Mertens family in 2014 swears that she "spoke with Norbert about his move and business plans and got the clear impression that he was here to stay."  In the same vein, Alexandra Hall, Miriam Hall, and Amy Chacón, each testified that the family never mentioned a departure date from the United States and that they seemed excited by their life in New Mexico and the opportunities it afforded them.  As discussed above, however, this testimony is essentially irrelevant.  The fact that the family did not mention when, if at all, it anticipated moving back to Germany implies nothing about their plans.  Further, the mere fact that the family enjoyed their life in New Mexico or found it exciting does not make it less likely that they had planned to return to Germany after one year.

***Fifth***, the *in camera* conversation with ACM emphatically supports Petitioner's version of events.  In chambers, ACM informed the Court that "my mom

promised me we would only go one year, and my dad did, too, because I didn't want

to go three years.  And now my mom says that she didn't, which I don't think is cool

at all." *In Camera* Transcript ("I. Tr.") at 8.  ACM continued that she only learned

that the family would not return to Germany in August 2015, after one year had

elapsed and expressed frustration that her mother has yet to explain why the

family has remained in New Mexico beyond one year.  *Id.* at 11, 20.  Ultimately, the

Court finds that a preponderance of the evidence supports Petitioner's version of

events and that the family agreed to live in the United States for approximately one

school year before returning to Germany.


**III.    The Children's Acclimatization to New Mexico**

In chambers, ACM indicated that she has not acclimatized to the United

States to a degree that would militate against her return to Germany.  To the

contrary, she indicated that over the course of her six-week trip to Germany during

the spring of 2015, she did "not really" miss anyone from New Mexico, except that

she "kind of missed [her] sister a little bit, but not really much," adding that she

was "not really" ready to come back to the United States at the end of the trip.  I.

Tr. at 14-15.  In fact, the strength of ACM's apparent attachment to Germany

resonated with the Court, particularly in light of ACM's uncommon maturity.  ACM

elaborated that, given a choice, she would "switch by years," spending alternating

years in Germany and the United States.  *Id.*  Thus, when asked about the current

situation, ACM stated that, at present, she wants to return to Germany, as had

11

been arranged, but that she would want to come back to the United States "like about a year later." *Id.* at 22.

Even so, family friends Alexandra and Miriam Hall testified that ACM and FSM appeared happy in New Mexico and that the girls were enjoying school and their activities in the United States. Amy Chacón, a New Mexico state official who focuses on New Mexico charter schools, supported this opinion, noting that she believed that ACM and FSM had adjusted well to their new school.

However, ACM's *in camera* statements find support in the Parties' submissions and witness testimony. For example, Thomas Jobst, in the affidavit described above, swears that ACM "was very much looking forward to her return to Paderborn, because she likes the school in Paderborn much better and she is able to do much more over here [in Germany] than in New Mexico." Ex. 1 at 2. In the same way, Michael Kretzer, a business associate of Petitioner, testified in his affidavit that during ACM's visit to Germany in spring 2015, ACM told Kretzer that "she is unhappy with the school in the states and that she'll be back when the year is over." Ex. 3 at 2. In aggregate, the Court finds that ACM and FSM are comfortable both in New Mexico and in Germany, although ACM might be more attached to Germany and FSM feel more at home in New Mexico.

## IV.    Procedural Posture

Petitioner initiated the instant proceedings on October 6, 2015 by filing his Verified Complaint and Petition for Return of the Children [Doc. 1] and Brief in Support of [the] Verified Complaint for Return of the Children [Doc. 2]. Evidently,

Petitioner filed an earlier action in the Eighth Judicial District Court, County of Taos, but dismissed it before the matter was resolved; Respondent's counsel suggested that this earlier petition should color the Court's view of the Petition before it, but counsel did not explain why this might be. Finally, there is no dispute that the Hague Convention governs resolution of this matter, as both Germany and the United States are signatories to the treaty. See Doc. 1 ¶1; Doc. 9 ¶ 1.

## DISCUSSION

### I. *In Camera* Testimony from ACM

After careful and deliberate contemplation, the Court ruled at the evidentiary hearing that it would examine ACM *in camera* with only its two law clerks and court reporter present. Ultimately, ACM's younger sister, FSM, also attended the session to serve as moral support, but not to testify. Having taken such testimony, the Court will avail itself of this opportunity to explain more completely its reasons for doing so.

As an initial matter, the parties concede that, at least in some circumstances, "in-camera interviews of children are considered appropriate in Hague Convention cases" and that Federal Rule of Evidence 601 states that all persons are competent to be witnesses. Doc. 32 at 2. *See also* Doc. 34 at 1-2. Nonetheless, Respondent argues that the ordinary purpose of in camera testimony in Hague Convention cases is to "establish one of the Article 13 defenses to return wherein a child of sufficient age and maturity objects to the return." Doc. 32 at 2. While this may be the ordinary purpose of such testimony, research reveals nothing in the Hague

Convention or ICARA that purports to limit a child's participation to such narrow circumstances.

To the contrary, in the Court's view, there is simply no logical basis for such a restriction. *Cf. Falk v. Sinclair*, Civ. No. No. 09–346–P–S, 2009 WL 4110757, at *2 (D. Maine Nov. 23, 2009) ("research discloses that at least one court, on the strength of the *Mozes* analytical construct, has in fact taken a child's testimony into account in determining the threshold issue of habitual residence, although the court did not deem the child's testimony controlling."); *Ago v. Odu*, No. 8:09–cv–976–T–17TBM, 2009 WL 2169857, at *10 (M.D. Fla. July 20, 2009) (considering child's testimony). Stated simply, if the Hague Convention presumes that "mature" children may testify that they do not wish to return a country, surely they may testify to the contrary. This follows ineluctably from the availability of such a defense: if a parent were to call a child to testify for the purposes of establishing this defense, but the child testified that, in fact, she wished to remain, surely the Court would not ignore that testimony merely because it turned out differently than the party expected.

Similarly, Federal Rule of Evidence 601 makes unambiguous that "[e]very person is competent to be a witness unless these rules provide otherwise." Fed. R. Evid. 601. No such rule excludes children. Consequently, federal district courts routinely permit children to testify in Hague Convention proceedings and then weigh their maturity and capacity when considering the value of their statements. *See, e.g., Falk*, 2009 WL 4110757, at *2 ("There is ample precedent for the taking of

14

testimony from a child of the same approximate age as this child [eight years old], on the basis of which the questions of the child's maturity, and any weight to be given to his or her testimony, then are decided."); *Anderson v. Acree*, 250 F. Supp. 2d 876, 882–84 (S.D. Ohio 2002) (after taking testimony from eight-year-old, court concluded that she was sufficiently mature to take her views into consideration, but did not rely solely on them in reaching decision not to repatriate her).

Moreover, other district courts have also found that *in camera* proceedings outside of the presence of the parties are appropriate in Hague Convention cases. In the *Falk* case, cited above, a district court confronting a situation similar to the one before this Court explained that it would "take the child's testimony *in camera*, as both parties agree, and in the presence of only two other individuals, my law clerk and the court reporter." *Falk*, 2009 WL 4110757, at *3. In the same vein, the Tenth Circuit affirmed a decision in which "the magistrate judge interviewed [a minor child] in camera with her law clerk and the court reporter present, but without the parents or their counsel in attendance." *de Silva v. Pitts*, 481 F.3d 1279, 1287 (10th Cir. 2007). *See also Jaet v. Siso*, No. 08–81232–CIV, 2009 WL 35270, at *5 (S.D. Fla. Jan. 5, 2009) ("The Court allowed the children to testify in camera on request of Respondent, and over the objection of Petitioner. The parties did agree that it would be helpful if Dr. Gerena was present during this testimony. The testimony took place in the presence of the undersigned, Dr. Gerena and a court stenographer."); *Broca v. Giron*, No. 11 CV 5818(SJ)(JMA), 2013 WL 867276, at *4 (E.D.N.Y. Mar. 7, 2013) ("On February 22, 2013, J.V. was interviewed in

camera outside of the presence of the parties and counsel.").  The Court followed these examples and did likewise.

Finally, the Court's interview with ACM vindicated this decision.  Over the course of the conversation, ACM revealed herself to be an exceptionally intelligent, composed, and mature nine-year-old, eminently capable of expressing complex feelings and recalling past events in precise detail.  Further, as will become apparent below, her testimony in this matter is emphatically relevant and reinforced the Court's tentative conclusion in this case.

## II.    The Hague Convention Framework

One principal "aim of the Hague Convention [on the Civil Aspects of International Child Abduction]" (the "Hague Convention" or the "Convention") is to "deter a parent dissatisfied with a current custodial arrangement from wrongfully retaining a minor child outside his or her country of residence while seeking a more favorable arrangement elsewhere."  *West v. Dobrev*, 735 F.3d 921, 923 (10th Cir. 2013).  To this end, the Hague Convention "generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States."  *Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2013).  *See also Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007) (the Hague Convention "creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody.").

16

In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act ("ICARA" or the "Statute"), formerly codified at 42 U.S.C. §§ 11601 *et seq.*, but now found at 22 U.S.C. §§ 9001 *et seq.* *See, e.g.*, *Navani*, 496 F.3d at 1124 (explaining the transposition).  ICARA, by its own terms, "empowers the courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4).  *See also* 22 U.S.C. § 9003(a) ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.").

## III.    Return Under the Hague Convention and ICARA

"Under the Hague Convention, the Court is mandated to return a child to [her] circumstances prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other and is, therefore, wrongful." *Carrasco v. Carrillo-Castro*, 862 F. Supp. 2d 1262, 1268 (D.N.M. 2012) (Vázquez, J.) (emphasis added, internal quotation marks omitted). Article 3 of the Hague Convention, in turn, states that the "removal or the retention of a child is to be considered wrongful where," the removal "is in breach of rights of custody attributed to a person... under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention."  HAGUE CONVENTION, Art. 3.

17

The Tenth Circuit has distilled this definition into three requirements that a petitioner must demonstrate in order to establish a *prima facie* case:  "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's custody rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention."  *Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002).  *See also, e.g., Avendano v. Smith*, 806 F. Supp. 2d 1149, 1164 (D.N.M. 2011) (reiterating the *Shealy* factors).  The party brining the petition bears the burden of proving the *prima facie* case by a preponderance of the evidence.  See 22 U.S.C. § 9003(e)(1)(A) ("A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence-- in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention.").

Once a petitioner satisfies its burden of establishing a *prima facie* case for wrongful removal, return of the children in question to their State of origin is mandatory, unless the respondent establishes any one of four possible affirmative defenses, in which case return is discretionary.  *See Smedley v. Smedley*, 772 F.3d 184, 186-87 (4th Cir. 2014) (if "removal or retention is found wrongful, Article 12 provides that the child must be returned unless certain defenses apply" in which case "return is discretionary.").  *See also Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) ("Once the petitioner establishes that removal was wrongful, the child must be returned unless the [respondent] can establish one of four defenses.") (alteration

original, internal quotation marks omitted); *West*, 735 F.3d at 930-31 ("Because Petitioner alleged a *prima facie* case for return of the children under Article 3 of the Convention and Respondent did not deny those allegations, the burden shifted to him to establish one of the affirmative defenses."); *Mendez v. May*, 778 F.3d 337, 343 (1st Cir. 2015) ("The respondent may counter the presumption of return by establishing the application of one or more of the exceptions or defenses to return enumerated in Articles 12, 13, and 20 of the Convention.").

"The defenses include the following:  (1) the person who had care of the child 'as not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention'; (2) there is a 'grave risk' that "return would expose the child to physical or psychological harm"; and (3) 'the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'" *Smedley*, 772 F.3d at 186-87.  Two of these defenses can be established by a preponderance of the evidence: "the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment, Hague Convention, Article 12; or, the person seeking return of the child consented to or subsequently acquiesced in the removal or retention." *Friedrich v. Friedrich* ("*Friedrich II*"), 78 F.3d 1060, 1067 (6th Cir. 1996).

The other two defenses must be shown by clear and convincing evidence: "[t]here is a grave risk that the return of the child would expose it to physical or psychological harm, or, the return of the child 'would not be permitted by the

19

fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." *Id* (internal citation omitted). *See also West*, 735 F.3d at 930-31 ("A court is not bound to return a child wrongfully retained or removed if the respondent establishes by clear and convincing evidence that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.") (internal quotation marks omitted).

All four of the exceptions are "narrow," and are "not a basis for avoiding return of the child merely because an American court believes it can better or more quickly resolve a dispute." *Friedrich II*, 78 F.3d at 1067. Moreover, a court "retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id*. In aggregate, then, this regime ultimately retains a great deal of flexibility and focuses solely on ensuring that the children are not inappropriately retained in the United States, rather than any substantive issues of child custody.

## IV.    The *Prima Facie* Case

### a. *Habitual Residence*

Any analysis under the Hague Convention must "begin and end with the question of [the children's] habitual residence at the time of removal." *Mendez*, 778 F.3d at 344. However, neither ICARA nor the Hague Convention defines the term "habitual residence," such that it must be determined in every case "by examining specific facts and circumstances" and "should not interpret[ed] technically or

20

restrictively." *Avendano*, 806 F. Supp. 2d at 1164. "Courts have widely recognized that the term should therefore be interpreted according to the ordinary and natural meaning of the two words it contains, as ... decided by reference to all the circumstances of any particular case." *Guzzo v. Cristofano*, 719 F.3d 100, 106 (2d Cir.2013).

In the absence of Tenth Circuit precedent regarding the definition of "habitual residence," this Court finds most persuasive the analysis of the First Circuit, which explained that "[i]n determining a child's habitual residence, this circuit looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, we may consider the child's acclimatization to his or her current place of residence." Mendez, 778 F.3d at 344. The court added, moreover that "[t]ypically, evidence of acclimatization alone cannot establish a child's habitual residence in the face of shared parental intent to the contrary." *Id.*

This approach also governs decision in the Fourth and Fifth Circuits. *See Smedley*, 772 F.3d at 186 ("United States federal courts analyze a child's habitual residence on a case-by-case basis, taking into account first, whether the parents share an intent to make a particular country the child's home, and second, whether enough time has passed for the child to acclimatize to the residence."); *Berezowsky v. Ojeda*, 765 F.3d 456, 466 (5th Cir. 2014) ("Like the majority of circuits, we have adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence" which "does not ignore the child's experience, but

rather gives greater weight to the parents' subjective intentions relative to the child's age."). This Court will adopt the approach of the First, Fourth, and Fifth Circuits in resolving the dispute before it.

### b. *Custodial Rights*

The second step of a *prima facie* case under the Hague Convention is to consider whether the petitioner had custody of the children at the time of removal. *See, e.g.*, *Yang v. Tsui*, 499 F.3d 259, 274 (3d Cir. 2007) ("The next step to consider is whether [petitioner] had custody of [child].").  While "the **definition** of 'rights of custody' under the Convention is an issue of treaty interpretation and does not depend on the domestic custody law of the country of habitual residence," the "**substance** of those custody rights, however, is provided by the domestic law of the State in which the child was habitually resident immediately before the removal." *Ozaltin v. Ozaltin*, 708 F.3d 355, 367 (2d Cir. 2013) (emphasis original, internal quotation marks omitted).  *See also Yang*, 499 F.3d at 275 ("To make a custody determination, it is necessary to carefully examine the country of origin's custody laws to determine whether the party seeking the child's return had custody rights in that country ... at the time the child was [retained].").  "In other words, domestic law (including certain public decisions and private agreements) supplies the substance of parental rights but the relevant provisions of the Hague Convention determine whether those rights are considered 'rights of custody' under the Convention." *Ozaltin*, 708 F.3d at 355.

### c. *Exercise of Custodial Rights*

The Court "liberally find[s] 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich II*, 78 F.3d at 1067. Accordingly, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id. See also, e.g.*, *Yang*, 499 F.3d at 277 ("Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights."); *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir. 2007) ("In light of these concerns, we find persuasive the nearly-universal approach taken by courts faced with the question of the exercise of custody rights, and we adopt it here. Accordingly, we will liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.") (internal quotation marks omitted). Hence, assuming that Petitioner can demonstrate that he has custodial rights to the children, it is almost certain that the Court will find that he exercised those rights.

## V.   The Instant Case

### a. Petitioner's *Prima Facie* Case

At the very latest, Respondent "retained" ACM and FSM in the United States in August 2015. *See, e.g.*, *In re Application of Stead v. Menduno*, 77 F. Supp. 3d 1029, 1035 (D. Colo. 2014) ("Respondent's unilateral decision to remain in the

23

United States with [the minor child] notwithstanding the assurances she gave to petitioner that [the minor child] would return to New Zealand breached this right [to determine the residence of the child].");  *In re R.V.B.*, 29 F. Supp. 3d 243, 254 (E.D.N.Y. 2014) ("In light of the Court's finding that the Father had 'rights of custody,' the Mother's retention of the Child in New York beyond the period of time consented to by the Father was wrongful.").  The question then remains whether Petitioner has established a *prima facie* case that this retention was "wrongful" for the purposes of the convention and ICARA.  The Court finds that he has.

### i.   Habitual Residence

ACM and FSM habitually resided in Germany before Respondent wrongfully retained them in the United States.  Adopting the majority rule succinctly summarized by the Fifth Circuit, this Court must first weigh "the parents' shared intent or settled purpose regarding their child's residence" and then consider "the child[ren's] experience" in light of the "child[ren]'s age."  *Berezowsky*, 765 F.3d at 466.  *See also Mendez*, 778 F.3d at 344 ("In determining a child's habitual residence, [the First Circuit] looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, we may consider the child's acclimatization to his or her current place of residence.").

The facts determined above establish, by the required preponderance, that Petitioner and Respondent intended to spend one year in the United States, after which the entire family would return to Germany, where ACM and FSM would resume school.  There was no shared intent for "the [children] to abandon"

24

Germany, in part because where an "initial move from an established habitual residence was clearly intended to be for a specific, limited duration[,] ... most courts will find no change in habitual residence." *Larbie v. Larbie*, 690 F.3d 295 (5th Cir. 2012) (modifications original; internal quotation marks omitted). Moreover, where, as here "the parents were still together at the time of the child's birth, made plans for the child's future, and only later did the family unit begin to dissolve," the "court's task is usually to try to determine when the parents last had a shared plan regarding their child's future, and what that plan entailed." *Berezowsky*, 765 F.3d at 468. Further, "when the parents have mutually intended that the child not acquire a new habitual residence, courts have generally concluded that the child has not acquired a new habitual residence." *Gitter v. Gitter*, 396 F.3d 124, 133 (2d Cir. 2005).

So it is here. Without repeating the thorough factual analysis conducted above, the Court finds that a preponderance of the evidence supports Petitioner's version of events. Consequently, the Court holds that the parents' last shared intent regarding the children's future was that they would return to Germany after approximately one year in the United States and that, therefore, they would not abandon their habitual residence in Germany.

This conclusion is reinforced by reference to the children's acclimatization. Conversation with ACM revealed to the Court that she is remarkably mature for her age and that, therefore, her views should contribute to the court's analysis. This testimony, coupled with the affidavits and testimony of third-party witnesses

makes clear that there is no basis to believe that the "relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Gitter*, 396 F.3d at 134 (internal quotation marks omitted). *See also, e.g.*, *Mendez*, 778 F.3d at 346 n.3 ("courts typically inquire into evidence of acclimatization when the party opposing return avers that the child's life is so firmly embedded in his or her new country that acclimatization should overcome the parties' past shared intent for the child to live elsewhere."). Stated differently, while ACM and FSM may be comfortable in New Mexico, there is nothing in the evidence before the Court that would lead it to conclude that returning the children to Germany would be the functional equivalent of uprooting them from their adoptive home.

### ii. Custodial Rights

Respondent does not genuinely dispute that Petitioner continues to enjoy custodial rights under German law and offers no evidence that would support such a contention. *See Shealy*, 295 F.3d at 1124 ("The Convention is very clear that the law of the country in which the child was habitually resident governs decisions as to whether custody rights existed at the time of removal."). *See also Ozaltin*, 708 F.3d at 355 ("In other words, domestic law (including certain public decisions and private agreements) supplies the substance of parental rights but the relevant provisions of the Hague Convention determine whether those rights are considered 'rights of custody' under the Convention."). Section 1626 of the Germany Civil Code makes

26

clear that both parents "have the duty and the right to care for the minor child." Ex. 47 at 2. *See also Kufner v. Kufner*, 519 F.3d 33, 39 (1st Cir. 2008) ("Under German law, where parents are married at the birth of the child, they have joint custody over the child until the operation of law (e.g., death of a parent) or a court order terminates joint custody."); *Shealy*, 295 F.3d at 1124 ("German law gives both parents equal *de jure* custody of a child, custody which continues with few exceptions until a competent court says otherwise."). Importantly, "under the Hague Convention, rights of custody include rights relating to the care of the child and the right to determine the child's place of residence." *Kufner*, 519 F.3d at 39.

Here, while the Eighth Judicial District Court has entered a temporary order granting sole physical custody to Respondent, this order entitles Petitioner to phone calls with his daughters and does not purport to limit his rights to determine the children's place of residence or participate in other decisions regarding their future. *See* Ex. I. *See also Shealy*, 205 F.3d at 1124 (custody order that gave one parent "the right to determine residence" of the child was dispositive because it resolved the sole question at issue in a Hague Convention petition). Thus, Petitioner has established by a preponderance that he continues to enjoy custodial rights and possessed such rights at the time Respondent retained the children in the United States.

### iii.  Exercise of Custodial Rights

Similarly, Respondent offers no evidence to suggest that Petitioner does not, and did not at the time the children were wrongfully retained, exercise his custodial

rights.   Indeed, once a parent establishes that he or she has custodial rights, finding "exercise" of those rights follows almost as a matter of course.  *See Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) ("if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.").

Here, the Court has little difficulty finding that Petitioner kept, or sought to keep, "any sort of regular contact with" his children.  *Id.* (courts "liberally find[s] 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child.").  At the evidentiary hearing, Petitioner revealed himself to be a caring and devoted father who, but for a court order to the contrary, would see his daughters regularly.  *See Kufner*, 519 F.3d at 39-40 (Petitioner "would have exercised his rights of custody but for [respondent's] removal of their sons from Germany.").  *See Castro v. Martínez*, 872 F. Supp. 2d 546, 555 (W.D. Tex. 2012) ("American courts interpret 'exercise' broadly, and thus, in the absence of a ruling from a court in the country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights.").

As it stands, Petitioner speaks with his daughters on the telephone or by other electronic means and legal custodial rights, including to determine where his daughters will live.  *See Márquez v. Castillo*, 72 F. Supp. 3d 1280 (M.D. Fla. 2014) ("Courts liberally find exercise whenever a parent with *de jure* custody rights keeps,

or seeks to keep, any sort of regular contact with his or her child.") (internal quotation marks omitted).  Thus, although current circumstances require his physical separation form his daughters, Petitioner has demonstrated by a preponderance of the evidence that he exercised custodial rights at the time Respondent wrongfully retained ACM and FSM.

> *b.* Defenses

Respondent has not pled any valid defenses in this case.  In her "Answer to Verified Complaint and Petition for Return of Children" she lists two "Defenses to Return," namely that the children's "Habitual Residence is Not Germany" and that "Petitioner Relocated the Family to the United States with the Intention of Remaining."  Doc. 9 at 5-7.  However, as discussed above, neither of these "defenses" is, in fact, a defense cognizable under the Hague Convention; rather, each is merely an assertion that Petitioner has not established a *prima facie* case.  Despite Respondent's insistence to the contrary, however, for the reasons discussed above, the Court finds that Petitioner has made his *prima facie* case and, in the absence of a defense, he is entitled to the return of the children under the Hague Convention and ICARA.

## VI.  Award of Fees and Costs

ICARA provides for an award of fees and costs to prevailing parties in an action brought pursuant to the Hague Convention.  Specifically, ICARA states:

> Any court ordering the return of a child pursuant to an action brought under
> section 9003 of this title shall order the respondent to pay necessary expenses

> incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

22 U.S.C. § 9007(3).  Here, in the absence of specific evidence regarding the applicable costs and fees in this matter, the Court will entertain a motion pursuant to D.N.M. LR-Civ. 54.5 within thirty (30) days of entry of this Order detailing the relevant amounts with corresponding factual support.  In the event that Respondent opposes the award of fees and costs, she is directed to respond to the motion and explain why "such order would be clearly inappropriate."  22 U.S.C. § 9007(3).

## CONCLUSION

For the reasons articulated above, the Court finds that ACM and FSM must be returned to Germany immediately.

**IT IS THEREFORE ORDERED** that Petitioner's Verified Complaint and Petition for Return of the Children [Doc. 1] and Brief in Support of [the] Verified Complaint for Return of the Children [Doc. 2] are **GRANTED.  Judgment will be entered by a separate order and shall supersede any conflicting state court order.**  *See Saldivar v. Rodela*, 879 F. Supp. 2d 610, 631 (W.D. Tex. 2012) ("an order issued by this Court pursuant to the Convention and ICARA preempts a conflicting state court order or judgment issued pursuant to state law.").

Dated this 18th day of November, 2015.

_____
MARTHA VÁZQUEZ
UNITED STATES DISTRICT JUDGE